**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT O'BRIEN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAI, BENNY P. MIKKELSEN, VINCENT ROCHE, DAVID J. ALDRICH, PETER Y. CHUNG, LAURINDA Y. PANG, STAN J. REISS, and JOHN RITCHIE,<br><br>Defendants. | **CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>Case No. ______________<br><br>JURY TRIAL DEMAND<br><br>CLASS ACTION |

Plaintiff, Robert O'Brien ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**<u>SUMMARY OF THE ACTION</u>**

1. Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Acacia Communications, Inc. ("Acacia" or the "Company"), against Acacia and its Board of Directors (the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of defendants' efforts to sell the Company to Cisco Systems, Inc., a California corporation ("Parent"), and Amarone Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub," and collectively with Parent, "Cisco"), as a

result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on a proposed all-cash transaction valued at a price of $70.00 per share (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a July 8, 2019 filing with the United States Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Acacia will become an indirect wholly-owned subsidiary of Cisco, and Acacia stockholders will receive $70.00 for each share of Acacia stock they own.

3. Thereafter, on July 26, 2019, Acacia filed a Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy") with the SEC in support of the Proposed Transaction.

4. The Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Preliminary Proxy describes an insufficient "sales process" in which the only end goal was a sale to Cisco, and in which a wholly inadequate "market check" was conducted.

5. Such a sales process, or lack thereof, indicates that the only end-goal acceptable to defendants was an acquisition of Acacia by Cisco.

6. Notably, Cisco is Acacia's fifth largest customer, accounting for 14 percent of the company's $339.9 million in revenue last year.

7. In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Acacia without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Cisco without regard for Acacia public stockholders. Accordingly, this action seeks to enjoin the Proposed Transaction and

compel the Individual Defendants to properly exercise their fiduciary duties to Acacia stockholders.

8. Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board members and executive officers will be able to exchange all Company equity awards for equity awards in Cisco with significant value.

9. In violation of Sections 14(a) and 20(a) of the Exchange Act, and further violation of their fiduciary duties, defendants caused to be filed the materially deficient Preliminary Proxy on July 26, 2019 with SEC in an effort to solicit stockholders to vote their Acacia shares in favor of the Proposed Transaction. The Preliminary Proxy is materially deficient, deprives Acacia stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction, and is thus in breach of defendants' fiduciary duties. As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process and certain conflicts of interest for management; (b) the financial projections for Acacia, provided by Acacia to the Company's financial advisor Goldman Sachs & Co. LLC ("Goldman Sachs") for use in its financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by the Company's financial advisor, Goldman Sachs.

10. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed

Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by defendants.

**PARTIES**

11. Plaintiff is a citizen of California and, at all times relevant hereto, has been an Acacia stockholder.

12. Defendant Acacia develops, manufactures, and sells high-speed coherent optical interconnect products in the United States, China, Germany, Thailand, and internationally. The Company offers embedded and pluggable module products consisting of optical interconnect modules with transmission speeds ranging from 100 to 1,200 gigabits per second for use in long-haul, metro, and inter-data center markets. It also provides semiconductor products, such as low-power coherent digital signal processor application-specific integrated circuits and silicon photonic integrated circuits that are integrated into embedded and pluggable modules. The Company sells its products through a direct sales force to network equipment manufacturers, network operators, and cloud service providers. Acacia is organized under the laws of the State of Delaware and has its principal place of business at Three Mill Place, Suite 400, Maynard, Massachusetts. Acacia common shares are traded on the NASDAQ under the symbol "ACIA."

13. Defendant Murugesan Shanmugaraj ("Shanmugaraj") has been a director at all relevant times. In addition, he serves as Chief Executive Officer ("CEO") of the Company.

14. Defendant Benny P. Mikkelsen ("Mikkelsen") has been a director at all relevant times. In addition, he serves as Chief Technology Officer ("CTO") of the Company.

15. Defendant Vincent Roche ("Roche") has been a director at all relevant times. In addition, Roche serves as the Chair of the Board.

16. Defendant David J. Aldrich ("Aldrich") has been a director at all relevant times. In addition, he serves as a member of the Board's Audit and Compensation Committees.

17. Defendant Peter Y. Chung ("Chung") has been a director at all relevant times. In addition, he serves as member on the Board's Audit Committee and Chair of the Nominating and Corporate Governance Committee.

18. Defendant Laurinda Y. Pang ("Pang") has been a director at all relevant times. In addition, she serves as a member of the Nominating and Corporate Governance and Compensation Committees.

19. Defendant Stan J. Reiss ("Reiss") has been a director at all relevant times. In addition, he serves as Chair of the Compensation Committee.

20. Defendant John Ritchie ("Ritchie") has been a director at all relevant times. In addition, he serves as the Chair of the Board's Audit Committee.

21. Defendants identified in ¶¶ 13 - 20 are collectively referred to as the "Individual Defendants."

22. Non-Defendant Cisco designs, manufactures, and sells Internet Protocol based networking and other products related to the communications and information technology industry worldwide. Cisco is a corporation organized under the laws of the State of California and has its principal place of business at 170 West Tasman Drive, San Jose, CA. Cisco common stock is traded on the NASDAQ under the ticker symbol "CSCO."

23. Non-Defendant Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

**JURISDICTION AND VENUE**

24. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

25. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Acacia is incorporated in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts with this District.

**CLASS ACTION ALLEGATIONS**

27. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Acacia who are being and will be harmed by defendants' actions described herein (the "Class"). The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the defendants.

28. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. According to the Company's most recently filed 10-Q, as of April 26, 2019, there were approximately 40.5 million Acacia common shares outstanding. The actual number of public stockholders of Acacia can be ascertained through discovery;

b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

   i. Whether defendants have violated the federal securities laws;

   ii. Whether defendants made material misrepresentations and/or omitted material facts in the Preliminary Proxy;

   iii. Whether the Proposed Transaction was fair to Plaintiff and the Class; and

   iv. Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f. Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY DUTIES**

29. By reason of the Individual Defendants' positions as officers and/or directors, said individuals are in a fiduciary relationship with Acacia's stockholders and owe them the duties of due care, loyalty, and good faith.

30. By virtue of their positions as directors and/or officers, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Acacia to engage in the practices complained of herein.

31. Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company's stockholders. To diligently comply with these duties, directors of a corporation must:

a. act with the requisite diligence and due care that is reasonable under the circumstances;

b. act in the best interest of the company's stockholders;

c. use reasonable means to obtain material information relating to a given action or decision;

d. refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e. avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f. disclose all material information relating to the company's affairs that they received by virtue of their positions in the company.

32. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers, are obligated to refrain from:

a. participating in any transaction where the directors' or officers' loyalties are divided;

b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the company's stockholders; and/or

c. unjustly enriching themselves at the expense or to the detriment of the company's stockholders.

33. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public stockholders of Acacia, including their duties of loyalty, good faith, and due care.

34. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Acacia common shares in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

***Company Background***

35. Acacia develops, manufactures, and sells high-speed coherent optical interconnect products in the United States, China, Germany, Thailand, and internationally. The Company offers embedded and pluggable module products consisting of optical interconnect modules with transmission speeds ranging from 100 to 1,200 gigabits per second for use in long-haul, metro, and inter-data center markets. It also provides semiconductor products, such as low-power coherent digital signal processor application-specific integrated circuits and silicon photonic integrated circuits that are integrated into embedded and pluggable modules. The Company sells its products through a direct sales force to network equipment manufacturers, network operators, and cloud service providers.

36. The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in a May 2, 2019 press release announcing its 2019 Q1 financial results, the Company highlighted such milestones as, among other things, a 44% increase in revenues year-on-year to revenues of $105.2 million.

37. Speaking on these positive results, President and CEO Shanmugaraj noted on the Company's positive financial results as follows, "I am pleased with our strong first quarter results, which exceeded the high end of our guidance on revenue, non-GAAP gross margin, non-GAAP net income and non-GAAP diluted EPS."

38. These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by Acacia. For example, in a February 21, 2019 press release

announcing its 2019 FY and Q4 financial results, the Company reported such financial accomplishments as a 23.7% increase in revenue year-on-year for Q4.

39. Speaking on these results, Individual Defendant Shanmugaraj noted, "In the fourth quarter, we made significant progress in our efforts to diversify our revenue base and expand our product portfolio. We believe our customers are well positioned with our products to meet the needs of compact DCI systems that are replacing traditional telecom DWDM systems in the edge DCI market, and believe that our roadmap is well aligned with network operator architectures for their next-generation deployments."

40. Based upon these positive financial results, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

41. Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Acacia to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

42. As detailed in the Preliminary Proxy, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Cisco, whose business with the Company comprised of 14% of the Company's revenues in 2018, and was predicted to account for 18.1% of the Company's revenue in the first quarter of 2019.

43. First, it appears that no market check whatsoever was conducted by Company or its financial advisor during the sales process. In fact, the Preliminary Proxy indicates that the

Board had contact with only two other interested entities throughout the sales process, both of which had independently contacted Acacia on their own behalf. The desire to sell Acacia to Cisco appears to have permeated the entire sales process.

44. In addition, despite the fact that serious negotiations with Cisco had been initiated as early as February of 2019, no independent committee of Acacia Board members was created to run the sales process until mid-June 2019 (the "Transaction Committee"), by which time the process was nearly complete and the outcome of a sale to Cisco was all but certain.

45. Moreover, as indicated in the Preliminary Proxy, the Transaction Committee never once spoke to the Board, or to the Company's legal or financial advisors, during the sales process regarding conducting a market check for potentially interested third parties.

46. In addition, the Preliminary Proxy does not indicate if the confidentiality agreements entered into between the Company on the one hand, and Cisco and other interested third parties on the other, differed in any meaningful ways from one another.

47. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate manner.

***The Proposed Transaction***

48. On July 9, 2019, Acacia and Cisco issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

> Cisco (NASDAQ: CSCO) and Acacia Communications (NASDAQ: ACIA) today announced they have entered into a definitive agreement under which Cisco has agreed to acquire Acacia. An existing Cisco supplier, Acacia designs and manufactures high-speed, optical interconnect technologies that allow webscale companies, service providers, and data center operators to meet the fast-growing consumer demands for data.
>
> Under the terms of the agreement, Cisco has agreed to acquire Acacia for $70.00 per share in cash, or for approximately $2.6 billion on a fully diluted basis, net of cash and marketable securities. As Cisco and Acacia come together, Cisco plans to

> support Acacia's existing customers and new customers that want industry-leading coherent optics, digital signal processing / photonic integrated circuit modules, and transceivers for use in networking products and data centers.
>
> "By innovating across software, silicon and optics, Cisco is reinventing every domain of the network with our intent-based architectures," said David Goeckeler, executive vice president and general manager of Cisco's networking and security business. "With the explosion of bandwidth in the multi-cloud era, optical interconnect technologies are becoming increasingly strategic. The acquisition of Acacia will allow us to build on the strength of our switching, routing and optical networking portfolio to address our customers' most demanding requirements."
>
> Cisco offers a full portfolio of optical systems to support webscale, service provider, enterprise, and public sector customer segments. These optical systems address performance, power, and cost requirements. Acacia's technology will enrich Cisco's optical systems portfolio. It will also allow the growing number of customers transitioning from chassis-based systems to pluggable technology to simplify operations and reduce network complexities.
>
> "Coherent technology has been a game-changer for optical networking and continues to evolve with the deployment of pluggable coherent optics," said Raj Shanmugaraj, president and chief executive officer, Acacia. "Upon close, Cisco and Acacia will continue to serve and support existing Acacia customers. By integrating Acacia technology into Cisco's networking portfolio, we believe we can accelerate the trend toward coherent technology and pluggable solutions while accommodating a larger footprint of customers worldwide."
>
> The acquisition is expected to close during the second half of Cisco's FY2020, subject to customary closing conditions and required regulatory approvals. Upon completion of this transaction, Acacia employees will join Cisco's Optical Systems and Optics business within the networking and security business under David Goeckeler.

***The Inadequate Merger Consideration***

49. Significantly, the Company's financial prospects and opportunities for future growth, and synergies with Cisco establish the inadequacy of the merger consideration.

50. First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company. Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements and

increases in the cash position of the Company in recent years. While the stock price dipped recently, affording Cisco the opportunity to claim a higher premium, the fact is that Acacia shares were trading over $60.00 a share just three months ago.

51. In February 2019, Acacia reported earnings and revenue for the fourth quarter that beat analyst estimates. As reported, adjusted earnings were 41 cents a share, up 52% from a year earlier, with revenue rising 24% to $107.1 million. A year earlier, Acacia earnings were 27 cents a share on sales of $86.6 million.

52. Additionally, Acacia's future success is likely, given the consistent positive financial results it has posted over the past several quarters.

53. Finally, the Proposed Transaction represents a significant synergistic benefit to Cisco. Wedbush analyst Daniel Ives noted the deal "makes a ton of strategic sense [to Cisco] on paper," and "Cisco is further building on its product footprint on the networking and cloud front, with M&A a linchpin toward this strategy over the next 12 to 18 months, especially with 5G around the corner."

54. Morningstar analyst Mark Cash ("Cash") told Reuters that the acquisition would put Cisco's optical portfolio ahead of the shift toward using plug-and-play devices. "Cisco's optical portfolio was mainly for short-range data center connections, and now gains Acacia's skillset in areas such as metro, long-haul and undersea," Cash told Reuters.

55. According to an article in Market Realist, "[f]or Cisco, the acquisition of Acacia would boost the capacity of existing fiber infrastructure by offering high-speed optical interconnect technologies across Cisco's switching, routing, and optical networks. The deal would also help reduce Cisco's supply chain costs and enable it to sell upgraded gear to hyperscale data

center owners such as Google and Amazon. The acquisition would also fit with Cisco's cloud, service provider, and enterprise customers."

56. While the deal will be beneficial to Cisco, it comes at great expense to Plaintiff and other public stockholders of the Company.

57. It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Cisco at the expense of Acacia stockholders, which indicates that Acacia stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

58. The Merger Agreement contains certain provisions that unduly benefit Cisco by making an alternative transaction either prohibitively expensive or otherwise impossible. Notably, in the event of termination, the Merger Agreement requires Acacia to pay up to $120 million to Cisco if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, Acacia must pay this termination fee even if it consummates any competing Company Acquisition Proposal (as defined in the Merger Agreement) within 12 months following the termination of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

59. The Merger Agreement also contains a "No Solicitation" provision that restricts Acacia from considering alternative acquisition proposals by, *inter alia*, constraining Acacia's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide

"Acquisition Proposal" if it constitutes or is reasonably calculated to lead to a "Superior Proposal" as defined in the Merger Agreement.

60. Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. The Individual Defendants agreed to provide Cisco information in order to match any other offer, thus providing Cisco access to the unsolicited bidder's financial information and giving Cisco the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Cisco.

61. Finally, an as of yet revealed percentage of the outstanding voting stock of Acacia, held by the directors and executive officers of the Company, have been committed to voting in favor of the Proposed Transaction through a voting agreement, thus ensuring that the Proposed Transaction will be that much more likely to be pushed through.

62. These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company's stockholders.

63. Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

64. The breakdown of the benefits of the deal indicate that Acacia insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique

benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Acacia.

65. Certain insiders stand to receive significant financial benefits as a result of the Proposed Transaction. Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction, which will be paid out as follows:

| Director or Officer | Number of Shares of Common Stock | | Cash Payment on Shares of Common Stock |
|---|---|---|---|
| Murugesan "Raj" Shanmugaraj | 856,792 | $ | 59,975,440 |
| John F. Gavin | 14,888 | $ | 1,042,160 |
| Eric L. Fisher | 4,501 | $ | 315,070 |
| Benny P. Mikkelsen | 875,909 | $ | 61,313,630 |
| Mehrdad Givehchi | 533,291 | $ | 37,330,370 |
| Christian J. Rasmussen | 488,533 | $ | 34,197,310 |
| Bhupendra C. Shah | 191,686 | $ | 13,418,020 |
| Vincent T. Roche | 10,908 | $ | 763,560 |
| David J. Aldrich | 2,155 | $ | 150,850 |
| Peter Y. Chung | 10,590 | $ | 741,300 |
| Stan J. Reiss | 212,994 | $ | 14,909,580 |
| John Ritchie | 15,166 | $ | 1,061,620 |
| Eric A. Swanson (1) | 17,806 | $ | 1,246,420 |
| Laurinda Y. Pang | 0 | $ | 0 |

66. Notably, Individual Defendants Shanmugaraj and Mikkelsen will each receive approximately $60 million and $61 million, respectively, for their current blocks of shares as a consequence of the Proposed Transaction.

67. Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award will be canceled and converted into the right to receive certain consideration according to the Merger Agreement, as follows:

| Director or Officer | Number of Shares Underlying Vested Stock Options | Cash Payment on Vested Stock Options | Number of Vested RSUs | Cash Payment on Vested RSUs | Number of Vested PRSUs | Cash Payment on Vested PRSUs | Aggregate Cash Payment on Vested Equity Awards at Closing |
|---|---|---|---|---|---|---|---|
| Murugesan "Raj" Shanmugaraj | 0 | $ 0 | 15,000 | $1,050,000 | 38,896 | $2,722,720 | $ 3,772,720 |
| John F. Gavin | 166,500 | $11,586,735 | 12,500 | $ 875,000 | 25,052 | $1,753,640 | $14,215,375 |
| Eric L. Fisher | 0 | $ 0 | 0 | $ 0 | 31,218 | $2,185,260 | $ 2,185,260 |
| Benny P. Mikkelsen | 0 | $ 0 | 12,500 | $ 875,000 | 24,308 | $1,701,560 | $ 2,576,560 |
| Mehrdad Givehchi | 0 | $ 0 | 12,500 | $ 875,000 | 24,308 | $1,701,560 | $ 2,576,560 |
| Christian J. Rasmussen | 39,535 | $ 2,751,241 | 12,500 | $ 875,000 | 24,308 | $1,701,560 | $ 5,327,801 |
| Bhupendra C. Shah | 18,546 | $ 1,290,616 | 12,500 | $ 875,000 | 24,308 | $1,701,560 | $ 3,867,176 |
| Vincent T. Roche | 0 | $ 0 | 4,010 | $ 280,700 | 0 | $ 0 | $ 280,700 |
| David J. Aldrich | 0 | $ 0 | 6,232 | $ 436,240 | 0 | $ 0 | $ 436,240 |
| Peter Y. Chung | 0 | $ 0 | 4,010 | $ 280,700 | 0 | $ 0 | $ 280,700 |
| Stan J. Reiss | 0 | $ 0 | 4,010 | $ 280,700 | 0 | $ 0 | $ 280,700 |
| John Ritchie | 0 | $ 0 | 4,010 | $ 280,700 | 0 | $ 0 | $ 280,700 |
| Eric A. Swanson | 0 | $ 0 | 0 | $ 0 | 0 | $ 0 | $ 0 |
| Laurinda Y. Pang | 0 | $ 0 | 6,451 | $ 451,570 | 0 | $ 0 | $ 451,570 |

68. Finally, several Company insiders, including Individual Defendants Shanmugaraj and Mikkelsen, have entered into lucrative post-close employment agreements with Cisco, further compensation not shared among the public stockholders of the Company.

69. Thus, while the Proposed Transaction is not in the best interests of Acacia stockholders, it will produce lucrative benefits for the officers and directors.

***The Materially Misleading and/or Incomplete Preliminary Proxy***

70. On July 26, 2019, the Acacia Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that, in violation of federal securities laws and their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*<u>Omissions and/or Material Misrepresentations Concerning the Sales Process Leading Up to the Proposed Transaction</u>*

71. Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Preliminary Proxy fails to disclose:

a. The reasoning as to why no market check was conducted by Company or its financial advisor during the sales process;

b. Why the Transaction Committee was not created until mid-June 2019;

c. The actual amount of the compensation due to Goldman Sachs as a result of the engagement. The Preliminary Proxy only estimates the fee and provides no information as to why only an estimate is provided;

d. Whether Huawei was a customer of the Company and, if so, the amount or percentage of revenue derived from this relationship;

e. Why the Company determined that an all-cash transaction was superior to a stock transaction; and

f. What the "subsequent developments" did to actually change the Company's long term forecast, leading to the revised LRP.

*<u>Omissions and/or Material Misrepresentations Concerning Acacia's Financial Projections</u>*

72. The Preliminary Proxy fails to provide material information concerning financial projections provided by Acacia's management and relied upon by Goldman Sachs in its analyses. The Preliminary Proxy indicates that in connection with the rendering of its fairness opinion, Goldman Sachs reviewed "certain internal financial analyses and forecasts for the Company

prepared by its management, as approved for Goldman Sachs' use by the Company, which are referred to as the 'Forecasts'" and "Goldman Sachs assumed with the Company's consent that the Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of the Company." Accordingly, the Preliminary Proxy should have, but fails to, provide certain information in the projections that Acacia management provided to Goldman Sachs. Courts have uniformly stated that "projections . . . are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-03 (Del. Ch. 2007).

73. With respect to the "Long Range Forecast" projections, the Preliminary Proxy provides non-GAAP financial metrics, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

74. Specifically, the Preliminary Proxy provides non-GAAP financial metrics, including Adjusted EBITDA, Non-GAAP Operating Income, Non-GAAP Net Income, and Non-GAAP Earnings Per Share, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

75. With respect to the "June LRP" projections, the Preliminary Proxy fails to disclose material line items for Non-GAAP financial measures; specifically, the Proxy provides non-GAAP financial metrics, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

76. Specifically, the Preliminary Proxy provides non-GAAP financial metrics, including Adjusted EBITDA, Non-GAAP Operating Income, Non-GAAP Net Income, and Non-GAAP Earnings Per Share, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics

77. Additionally, the Preliminary Proxy fails to provide the line items necessary for the calculation of Unlevered Free Cash Flows.

78. In addition, the Preliminary Proxy does not indicate why the June LRP was not provided to Party C.

79. Further, the Preliminary Proxy fails to provide the October Projections and, as already stated, fails to properly address the changes necessitated due to the "subsequent developments."

80. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

81. Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Acacia are unable to properly evaluate the Company's true worth or the accuracy of Goldman Sachs' financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Goldman Sachs*

82. In the Preliminary Proxy, Goldman Sachs describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

83. With respect to the *Selected Companies Analysis*, the Preliminary Proxy fails to disclose the following:

a. The specific benchmark multiples for each comparable company; and

b. The specific benchmark multiples for Acacia.

84. With respect to the *Illustrative Present Value of Future Share Price Analysis*, the Preliminary Proxy fails to disclose the following:

a. The specific inputs and assumptions used to calculate Acacia's illustrative NTM EV/EBTIDA multiple range of 14.0x to 18.0x;

b. The specific inputs and assumptions used to calculate the illustrative discount rate of 9.5%;

c. The fully diluted outstanding shares of the Company as utilized in this analysis; and

d. The specific inputs and assumptions used to calculate Acacia's illustrative NTM P/E multiple range of 20.0x to 25.0x.

85. With respect to the *Illustrative Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

a. The specific inputs and assumptions used to calculate the discount rate range of 9.0% - 10.0% as well as the Company's weighted average cost of capital;

b. The number of fully diluted outstanding shares of the Company utilized in the analysis and the illustrative terminal values; and

c. The specific inputs and assumptions used to calculate the perpetuity growth rate range of 2.75% - 3.75%.

86. With respect to the *Selected Transactions Analysis*, the Preliminary Proxy fails to disclose the following:

a. The total value of each selected transaction; and

b. The specific date on which each selected transaction closed.

87. With respect to the *Premia Analysis*, the Preliminary Proxy fails to disclose the following:

a. The specific entities involved in each of the "all-cash acquisition transactions announced during the five-year period preceding July 5, 2019 involving a public company in the technology sector based in the United States as the target where the disclosed enterprise values for the transaction were greater than $1 billion" analyzed;

b. The specific date on which each of the selected transaction closed; and

c. The specific premiums paid in each of these selected transactions.

88. These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

89. Without the omitted information identified above, Acacia's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, Acacia's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests. As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

**FIRST COUNT**

**Claims for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

90. Plaintiff repeats all previous allegations as if set forth in full herein.

91. The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

92. By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Acacia.

93. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Acacia by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Acacia to its public stockholders.

94. Indeed, defendants have accepted an offer to sell Acacia at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

95. Moreover, the Individual Defendants breached their duty of due care and disclosure by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

96. The Individual Defendants dominate and control the business and corporate affairs of Acacia, and are in possession of private corporate information concerning Acacia's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and

economic power between them and the public stockholders of Acacia which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

97. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

98. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Acacia's assets and have been and will be prevented from obtaining a fair price for their common shares.

99. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

100. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

**SECOND COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(<u>Against All Defendants</u>)**

101. Plaintiff repeats all previous allegations as if set forth in full herein.

102. Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

103. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

104. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

105. The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, defendants knew or should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

106. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

107. The Individual Defendants were at least negligent in filing a Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

108. The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to vote their shares in favor of the Proposed Transaction on the basis of complete

information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**THIRD COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(<u>Against All Individual Defendants</u>)**

109. Plaintiff repeats all previous allegations as if set forth in full herein.

110. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders.

111. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

112. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Acacia's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

113. The Individual Defendants acted as controlling persons of Acacia within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Acacia to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Acacia and all of its employees. As alleged above, Acacia is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining the Proposed Transaction;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E. Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Acacia and obtain a transaction which is in the best interests of Acacia's stockholders;

F. Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H. Granting such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: August 5, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Gina M. Serra*
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**BRODSKY & SMITH, LLC**
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Email: mackerman@brodskysmith.com